863 So.2d 138 (2003)
CITY OF GAINESVILLE, Appellant/Cross-Appellee,
v.
STATE of Florida, et al., Appellees/Cross-Appellants.
No. SC02-1696.
Supreme Court of Florida.
September 4, 2003.
*140 Marion J. Radson, City Attorney, and Elizabeth A. Waratuke, Litigation Attorney, City of Gainesville, Gainesville, FL; and Steven L. Brannock of Holland & Knight LLP, Tampa, FL, for Appellant/Cross-Appellee.
William P. Cervone, State Attorney, and Lee C. Libby, Assistant State Attorney, Eighth Judicial Circuit, Gainesville, FL; and Pamela S. Leslie, General Counsel, and Marianne A. Trussell, Deputy General Counsel, Department of Transportation, Tallahassee, FL, for Appellees/Cross-Appellants.
*141 James R. English, City Attorney, and Linda R. Hurst, Assistant City Attorney, Tallahassee, FL, for City of Tallahassee, Florida, Amicus Curiae.
Harry Morrison, Jr. and Rebecca A. O'Hara, Tallahassee, FL, for Florida League of Cities, Inc., Amicus Curiae.
Alan S. Zimmet and Elita D. Cobbs, Clearwater, FL, for City of Largo, Florida, Amicus Curiae.
Erin L. Deady, Miami, FL; and C. Allen Watts and Ty Harris of Cobb & Cole, Daytona Beach, FL, for Florida Stormwater Association, Inc., Earthjustice, Inc., Audubon of Florida, Inc., and Environmental Confederation of Southwest Florida, Inc., Amici Curiae.
CANTERO, J.
The City of Gainesville appeals a circuit court order dismissing its complaint, which sought validation of a proposed bond issue. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const. The issue is whether the City's stormwater fees constitute a user fee, which are authorized under Florida Statutes, or a special assessment, which generally may not be charged to state agencies. The issue is relevant to the bond validation because the City pledged the stormwater fees as collateral for the bonds. Thus, if the fees are invalid, the bonds cannot be approved. See, e.g., Keys Citizens for Responsible Gov't, Inc. v. Florida Keys Aqueduct Auth., 795 So.2d 940, 947 (Fla.2001) (noting that where the municipality's fees are tied to the financing agreement on which the bonds will be secured, the validity of the fees are part of the court's inquiry into whether the public body has the authority to issue the bonds). For the reasons stated below, we find that the stormwater fees constitute valid user fees. Therefore, we reverse the order and remand with directions to enter a judgment validating the bonds.

I. FACTS
Stormwater runoff may cause flooding and threatens water quality in urban areas. See § 403.031(16), Fla. Stat. (2002) (noting that the objective of a stormwater management system is to prevent or reduce flooding and pollution). Therefore, stormwater must be collected, conveyed, treated, and disposed of. Florida law requires local governments to establish stormwater management programs. § 163.3202(2)(d), Fla. Stat. (2002); § 403.0891, Fla. Stat. (2002). To fund such programs, local governments may "[c]reate one or more stormwater utilities and adopt stormwater utility fees sufficient to plan, construct, operate, and maintain stormwater management systems set out in the local program required pursuant to s. 403.0891(3)." § 403.0893(1), Fla. Stat. (2002). A stormwater utility is defined as
the funding of a stormwater management program by assessing the cost of the program to the beneficiaries based on their relative contribution to its need. It is operated as a typical utility which bills services regularly, similar to water and wastewater services.
§ 403.031(17), Fla. Stat. (2002).
The City created a stormwater utility. It based the rate structure for the utility fee on the "impervious area" of land. Impervious area means that part of the land through which stormwater cannot permeate, thus creating stormwater runoff.[1] *142 The vast majority of stormwater utilities across the country establish their rate structures by measuring impervious area.
Instead of calculating the exact amount of impervious area on each residential parcel, the City used statistical estimates. The most common unit that stormwater utilities use to measure impervious area is the Equivalent Residential Unit (ERU). An ERU is generally established as the average or median impervious area of a single-family home. In this case, the City determined that the median single-family property in the City included 2300 square feet of impervious area. Based on this calculation, the City established 2300 square feet as one ERU. It then created three classes of users and assigned different ERUs to each class. Most single-family properties are assigned one ERU. The City found that the impervious area of multi-family residential units was generally lower than for single-family homes. It therefore assigned .6 ERUs for apartments and mobile homes and 1.0 ERU for condominiums and duplexes.
For nonresidential properties, the City measured each property individually (over 3000 total) and assigned an ERU value to each. The ERU value is determined by measuring the square footage of impervious area on the property and dividing by 2300.
Under the City's rate structure, properties that do not use the stormwater systemthat is, that retain all stormwater on-siteare not charged a fee.[2] For example, the City does not impose the fee on undeveloped properties because they contain no impervious area. Also, the University of Florida campus drains into a lake for which the University provides all stormwater management services.
The City charges the fees on a monthly basis. It uses the revenue generated exclusively for stormwater management services. Gainesville, Fla., Code art. V, § 27-242. Delinquent charges may be referred to a collection agency, or to the city attorney. Id. The Code does not permit placement of a lien on property to collect delinquent charges.
The Department of Transportation (DOT) refused to pay the City's stormwater fees, arguing that it was exempt from such charges because the fees constituted either a tax or a special assessment.[3] The City filed a complaint seeking a judgment declaring that the stormwater fees constituted valid user fees and not special assessments, and claiming damages for unpaid *143 fees. The circuit court dismissed the complaint on the DOT's motion, ruling as a matter of law that the City's stormwater fees constituted a special assessment. The First District Court of Appeal reversed. In a thorough opinion, the court held that the City's ordinance, "if it operates as the City has alleged"that is, if it assesses the cost of the program to the beneficiaries based on their relative contribution to its need and operates as a typical utility which bills services regularly"imposes utility service fees rather than special assessments." City of Gainesville v. State Dep't of Transp., 778 So.2d 519, 527 (Fla. 1st DCA 2001). The City, however, did not pursue that litigation and eventually filed a voluntary dismissal.
The issue of DOT's obligation to pay the stormwater fees arose again in 2001, when the City Commission approved issuance of revenue bonds to fund capital improvements to the stormwater system. Revenues from the stormwater fees will pay for the bonds. The City filed a complaint under section 75.04, Florida Statutes (2001), seeking to validate its proposed bond issue. The State and the DOT opposed validation. The DOT again argued that the stormwater fees were invalidor at least did not apply to state agencies because they constituted a tax or special assessment. All parties agreed that the only impediment to issuing the bonds was the validity of the underlying ordinance.
The circuit court held an evidentiary hearing. The court dismissed the complaint, finding that the City's fee was not based on the amount of stormwater a customer contributes to the system and that the fee was not voluntary. The court concluded that "the City of Gainesville does not have the authority to incur the obligations which are the subject of this action." The court denied the City's motion for rehearing and clarification. This appeal follows.

II. SCOPE AND STANDARD OF REVIEW
We have previously explained the scope of a bond validation proceeding: "[C]ourts should: (1) determine if a public body has the authority to issue the subject bonds; (2) determine if the purpose of the obligation is legal; and (3) ensure that the authorization of the obligation complies with the requirements of law." State v. City of Port Orange, 650 So.2d 1, 2 (Fla. 1994). "Subsumed within the inquiry as to whether the public body has the authority to issue the subject bond is the legality of the financing agreement upon which the bond is secured." Id. at 3. In this case, the stormwater fees are pledged to repay the bonds. The validity of those fees is the only issue. We review the trial court's findings of fact for substantial competent evidence and its conclusions of law de novo. City of Boca Raton v. State, 595 So.2d 25, 31 (Fla.1992) (upholding trial court findings that were based on competent substantial evidence); Panama City Beach Cmty. Redev. Agency v. State, 831 So.2d 662, 665 (Fla.2002) ("It is clear that this Court's review of the trial court's conclusions of law is de novo.").

III. ANALYSIS
To determine the legality of the financing agreement we must address two issues: (A) whether the City's fee is a user fee or a special assessment; and (B) the propriety of the City's fee structure. We address these issues in turn.

A. User Fee or Special Assessment?
DOT does not argue that the stormwater fees constitute a tax. Therefore, in determining the validity of the bonds, we must decide whether the City's stormwater fee constitutes a user fee or a *144 special assessment. If the stormwater fee is a user fee, the fee is valid and the State and DOT, as beneficiaries of the system, can be charged. If the fee is a special assessment, however, the State and DOT cannot be assessed the fee absent statutory authorization. See City of Gainesville, 778 So.2d at 521-22 (noting that state agencies may not be charged special assessments absent a statute specially authorizing special assessments on state property) (quoting Blake v. City of Tampa, 115 Fla. 348, 156 So. 97, 99 (1934)).
We acknowledge that under the authorizing statute a municipality may fund its stormwater management system either through the use of user fees or through special assessments. See generally § 403.0893, Fla. Stat. (2002). However, when a municipality chooses to fund its stormwater management system through special assessments, it does so pursuant to section 403.0893(3) and therefore does not technically establish a stormwater utility. Compare § 403.0893(1) (authorizing the creation of a stormwater utility and the imposition of stormwater utility fees), with § 403.0893(3) (authorizing special assessments to fund a stormwater management system). Although section 403.0893(3), Florida Statutes, authorizes special assessments, the City has not followed the required procedures under that section. Rather, the City has established a stormwater utility under section 403.0893(1) and has imposed utility fees. Therefore, the stormwater fees are only legal if they constitute user fees.
We have previously recognized that user fees and special assessments are similar. See Collier County v. State, 733 So.2d 1012, 1018-19 (Fla.1999). We have defined user fees as
charges based upon the proprietary right of the governing body permitting the use of the instrumentality involved. Such fees share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner not shared by other members of society, and they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge.
City of Port Orange, 650 So.2d at 3 (citations omitted). Similarly, special assessments are "charge[s] assessed against [the] property of some particular locality because that property derives some special benefit [from] the expenditure of [the] money." Workman Enters., Inc. v. Hernando County, 790 So.2d 598, 599 (Fla. 5th DCA 2001) (quoting Atlantic Coast Line R.R. Co. v. City of Gainesville, 83 Fla. 275, 91 So. 118, 121 (1922)).
As the First District noted in the related case, "[t]he boundary between special assessments and user fees is not always clear." City of Gainesville, 778 So.2d at 526. One leading authority has explained the difference between user fees and special assessments as follows:
In determining whether a charge for connecting property with the municipal water service is a "fee" or an "assessment," the name given to the charge is not controlling; it is the reason for the charge which controls its nature, and if it is a charge made for the improvement of a certain piece of property, it is an assessment. Similarly, charges for connection to or the use of a sewer generally are not deemed taxes.
There is no bright-line test for distinguishing between a connection/use fee and a special assessment; generally, a "fee" is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of *145 the service or benefit, while a "special assessment" is a specific levy designed to recover the costs of improvements that confer local and peculiar benefits upon property within a defined area. "User fees" are those which are charged only to the person actually using the service, and the amount of the charge generally is related to the actual goods or services provided and is a monthly charge rather than a one-time charge.
70C Am.Jur.2d, Special or Local Assessments § 2, at 631-32 (2000) (footnotes omitted), quoted in City of Gainesville, 778 So.2d at 526.
We therefore consider various factors in determining whether the stormwater fees in this case constitute a user fee or a special assessment. These include: the name given to the charge; the relationship between the amount of the fee and the value of the service or benefit; whether the fee is charged only to users of the service or is charged to all residents of a given area; whether the fee is voluntary that is, whether a property owner may avoid the fee by refusing the service; whether the fee is a monthly charge or a one-time charge; whether the fee is charged to recover the costs of improvements to a defined area or infrastructure or for the routine provision of a service; whether the fee is for a traditional utility service; and whether the fee is statutorily authorized as a fee. None of these factors is controlling; nor are they necessarily exclusive. Rather, we must consider each factor in light of the circumstances as a whole in each particular case.
In this case, considering all the circumstances, we conclude that the stormwater fees constitute a user fee, not a special assessment. The City itself calls the fee a user fee, which is not dispositive but is relevant. Moreover, the City charges the fees on a monthly basis, not as a one-time charge.
The City's creation of a stormwater utility, as the statute authorized, is a strong factor militating in favor of finding the stormwater fees a user fee. The City "establish[ed] stormwater management as a city utility enterprise in accordance with F.S. § 403.0893" and "establish[ed] a program of user charges for stormwater management service to be charged to all developed property within the city that contributes stormwater runoff to the city's stormwater management systems to accomplish the functions of such utility." Gainesville, Fla., Code art. V, § 27-236.
We have previously recognized that the creation of a statutorily-authorized utility strongly favors the validity of the fees imposed. In Pinellas County v. State, 776 So.2d 262, 268 (Fla.2001) (footnote omitted), we noted that "where a governmental entity provides access to traditional utility services, this Court has not hesitated to uphold local ordinances imposing mandatory fees, regardless of whether the individual customer actually uses or desires the service." In a footnote, we cited stormwater management programs defined under section 403.031(17), Florida Statutes (1997) as one category of many statutorily-authorized programs imposing mandatory fees to recoup the costs of providing water service. Id. at 268 n. 11. In another footnote, we noted that water systems are equivalent to traditional utilities such as sewer systems. Id. at 268 n. 10. Also, in City of Port Orange, 650 So.2d at 4, we distinguished a transportation utility fee that we held to be a tax from stormwater utility fees, noting that "storm-water utility fees are expressly authorized by section 403.031, Florida Statutes (1993)." See also City of Dunedin v. Contractors & Builders Ass'n, 312 So.2d 763, 766 (Fla. 2d DCA 1975) ("The imposition of fees for the use *146 of a municipal utility system is not an exercise of the taxing power nor is it the levy of a special assessment.") (citing State v. City of Miami, 157 Fla. 726, 27 So.2d 118 (1946)), quashed on other grounds, 329 So.2d 314 (Fla.1976). Therefore, the fact that the City has created a statutorily-authorized utility to provide stormwater management services militates strongly in favor of finding that the stormwater fees are user fees.
The State and DOT argue that the City's fee constitutes a special assessment because it is not voluntary. The evidence showed, however, that in most cases the fee is voluntary. The City requires only properties that actually use the system to pay the fee. Properties that are either undeveloped or implement ways to retain all stormwater on site are exempted. Therefore, property owners can avoid the fee either by not developing the property or by implementing a system to retain stormwater on site. See City of Gainesville, 778 So.2d at 525 (holding that "[b]ecause a landowner can refuse the City's stormwater utility service and prevent liability for stormwater utility fees by containing runoff, the fees are neither a tax nor a special assessment").
Nevertheless, the State and DOT argue that regarding apartment complexes in particular, because the City charges the fee to the tenants, not the owners, and because the tenants cannot avoid the fee, the fee is not voluntary as to those tenants. They rely on Port Orange, 650 So.2d at 3, in which we noted that "[user fees] are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge." In this case, however, tenants may avoid the charge by choosing to live in multi-family dwellings that do not use the City's stormwater system.
Even if we accept the proposition that tenants have no choice, although the voluntariness of the fee is one factor to consider, it is not dispositive. In Pinellas County, 776 So.2d at 268, we noted that we have upheld even mandatory fees for traditional utility services. A stormwater utility is similar to wastewater and sewer systems. Florida courts have upheld mandatory fees for such systems. See State v. City of Miami Springs, 245 So.2d 80 (Fla. 1971) (holding that a municipality may charge a mandatory fee for sewer service unrelated to actual use); Town of Redington Shores v. Redington Towers, Inc., 354 So.2d 942 (Fla. 2d DCA 1978) (holding that the subject sewer fee applied to unoccupied condominiums without regard to actual use); see also Stone v. Town of Mexico Beach, 348 So.2d 40 (Fla. 1st DCA 1977) (upholding a mandatory flat rate for garbage service, regardless of use); City of Riviera Beach v. Martinique 2 Owners Ass'n, 596 So.2d 1164 (Fla. 4th DCA 1992) (holding that the subject solid waste removal ordinance applied to unoccupied condominiums without regard to actual use). Therefore, where a statute authorizes a utility fee, such fees may be considered user fees even though mandatory. In Port Orange, we noted that the transportation utility fee at issue was not statutorily authorized and therefore was not analogous to stormwater utility fees or other utility fees authorized by statute. We did not suggest that utility fees will only be considered user fees if they are voluntary, only that, where not authorized by statute, a valid user fee involves an element of choice. Again, we emphasize that a court must consider all the circumstances together, and none in isolation, in determining whether a particular charge is a user fee or a special assessment.

B. The Propriety of the City's Fee Structure
DOT argues, and the trial court concluded, that the City's ordinance *147 violated section 403.031(17), Florida Statutes, because the fees are not based on the amount of stormwater a customer contributes to the system. We begin with the well-settled principle that the establishment of utility rates is generally a legislative function. Mohme v. City of Cocoa, 328 So.2d 422, 424 (Fla.1976). In setting utility rates, municipalities enjoy a certain latitude. City of Gainesville, 778 So.2d at 525 (citing State v. City of Miami, 157 Fla. 726, 27 So.2d 118, 125 (1946)). A city may charge different rates to different classes of users so long as the classifications are not arbitrary, unreasonable, or discriminatory. City of Miami Springs, 245 So.2d at 81.
Section 403.031(17) requires that the fees charged be based on the beneficiaries' "relative contribution" to the need for a stormwater management system. Acting within its legislative discretion, the City determined that rain does not create the need for a stormwater management system. Rather, the need is created by impervious area, which prevents the rain from percolating into the ground. Therefore, the City properly based its fee on the amount of impervious area on each property. Moreover, in calculating the impervious area, the City acted within its discretion by using statistical estimates to determine that the typical single-family home in Gainesville creates a relatively equal need for a stormwater system. The City determined that the median single-family property in the City included 2300 square feet of impervious area, and based its ERUs on that figure. Those single-family homes that create a disproportionately greater need for the systemi.e., homes with more than 50 percent impervious area and situated on lots with more than 10,000 square feet of total areaare billed separately. Thus, the City's approach is reasonable. Section 403.0891(6), Florida Statutes, expressly authorizes this method of apportioning cost.[4] The evidence showed that most stormwater utilities across the country use ERUs to estimate stormwater use. Courts in other states have upheld such a measurement. See Teter v. Clark County, 104 Wash.2d 227, 704 P.2d 1171, 1179 (1985) (refusing to require the municipality to measure each residential lot to ascertain the exact amount of impervious surface on each one).
DOT takes issue with the City's use of a flat rate that does not account for the particular property's actual use of the system.[5] As the First District recognized in considering this issue, however, stormwater runoff, like wastewater and solid wasteand unlike potable water, gas, and electricitycannot feasibly be metered. City of Gainesville, 778 So.2d at 525. In City of Miami Springs, 245 So.2d at 81, we upheld an ordinance setting a flat sewer fee of $7.00 per month for single-family residences and a variable rate based on use for all other users. Other Florida courts regularly have upheld flat rates for utility services. See City of New Smyrna Beach v. Fish, 384 So.2d 1272, 1273 (Fla. 1980) (upholding an ordinance setting garbage collection rates that established a flat rate for single-family residences and multifamily residences of a certain size and a *148 variable rate for all others based on the number and size of the containers); Town of Mexico Beach, 348 So.2d at 42 (upholding an ordinance charging a flat garbage rate for all residential users regardless of whether premises were occupied); Pinellas Apartment Ass'n v. City of St. Petersburg, 294 So.2d 676, 678 (Fla. 2d DCA 1974) (noting that "[t]he setting of utility rates is often a complicated process and mathematical exactitude cannot be required").
Cases in other states also have upheld rates that do not precisely correlate with actual use. See Home Builders Ass'n of Utah v. City of American Fork, 973 P.2d 425, 429 (Utah 1999) (warning that "municipalities must have sufficient flexibility to deal realistically with issues that do not admit of any kind of precise mathematical equality"); McDonald Mobile Homes, Inc. v. Village of Swansea, 56 Ill.App.3d 759, 14 Ill.Dec. 102, 371 N.E.2d 1155, 1158 (1977) (upholding sewer fees where single-family residences, apartments, motel rooms and mobile homes were all placed in one classification, and commercial in another, noting that "[w]hile we agree with plaintiffs that defendant's method for determining sewer use is not scientifically precise, we believe there is a substantial correlation between water consumption and sewer use and that the Village's scheme for assessing sewer use charges is a reasonable exercise of its legislative authority"); McGrath v. City of Manchester, 119 N.H. 109, 398 A.2d 842, 845 (1979) (noting that "[t]he fact that absolute mathematical equality is not achieved does not render the system invalid"); Watergate II Apartments v. Buffalo Sewer Auth., 46 N.Y.2d 52, 412 N.Y.S.2d 821, 385 N.E.2d 560, 564 (1978) (recognizing that "[w]here only an approximation of cost or value is possible, discrepancies may have to be endured in the name of administrative flexibility so long as there exists some rational underpinning on the charges levied").
The City also acted within its discretion in creating separate categories for multifamily homes and nonresidential property. For commercial properties, the City actually measures both impervious and semi-impervious area to determine the amount of stormwater runoff. We find nothing irrational in the distinction between runoff from single-family residences, for which the amount of runoff will vary but little from home to home, and those for commercial properties, which may vary more significantly. We have upheld such distinctions between residential and commercial properties in setting utility rates. See Miami Springs, 245 So.2d at 81 (upholding an ordinance setting a flat sewer fee of $7.00 per month for single-family residences and a variable rate based on use for all other users).

IV. ISSUES ON CROSS APPEAL
DOT raises two issues on cross appeal: whether sovereign immunity bars the City from collecting stormwater fees from DOT; and whether the City must consider the DOT's contribution to the stormwater system in assessing any fee against DOT-owned property. Such issues are beyond the scope of a bond validation proceeding and therefore we do not address them. The DOT is free to assert those arguments in another forum.

V. CONCLUSION
The financing agreement upon which the City's proposed bond issue is secured is legal. Accordingly, we reverse the trial court's dismissal of the City's complaint and remand with instructions for the trial court to enter an order validating the City's bonds. We also reverse the award of costs to DOT.
It is so ordered.
*149 ANSTEAD, C.J., and WELLS, PARIENTE, QUINCE, and BELL, JJ., concur.
LEWIS, J., concurs in result only.
NOTES
[1] The City of Gainesville Code defines "impervious area" as "any part of any parcel of land that has an impermeable cover caused to be erected or constructed by the action of persons, and such covers include, but are not limited to, buildings, parking lots, driveways, patios, decks, walkways, and athletic courts." Gainesville, Fla., Code art. V, § 27-237 (2001).
[2] In applying the ordinance, the City gives partial credit when properties retain some, but not all, stormwater onsite. The ordinance itself, however, states that "[a] minimum value of 1.0 ERU shall be assigned to each nonresidential/commercial property unless such property has earned a 100-percent retention credit, in which case, the property will be assigned a value of 0.0 ERU." Gainesville, Fla., Code art. V, § 27-241(b)(3) (2002). Therefore, we analyze the City's stormwater management program according to the language of the ordinance.
[3] If the stormwater fees were a tax, they would be illegal because the Florida Constitution authorizes municipalities to impose only ad valorem taxation "except as provided by general law," see art. VII, § 1(a), Fla. Const., and no law has authorized such a tax. Special assessments are not taxes because they confer a special benefit on the land burdened by the assessment. See City of Boca Raton v. State, 595 So.2d 25, 29 (Fla. 1992). As a state agency, however, DOT would be exempt from special assessments absent a statute specially authorizing, either explicitly or "by necessary implication," special assessments on state property. See City of Gainesville v. State Dep't of Transp., 778 So.2d 519, 521-22 (Fla. 1st DCA 2001) (quoting Blake v. City of Tampa, 115 Fla. 348, 156 So. 97, 99 (1934)).
[4] Section 403.0891(6) requires that agencies and local governments develop a model stormwater management program containing dedicated funding options, "including a stormwater utility fee system based upon an equitable unit cost approach."
[5] At trial, DOT argued that the City had to measure the precise amount of stormwater runoff from each property, but acknowledged that implementing a system for accurately measuring the runoff was prohibitively expensive, if it was available at all. The DOT has abandoned this argument on appeal.